UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| NICHOLAS S. PENNINGTON, ) | |
|     Plaintiff, ) | |
| ) | |
|   vs. ) | 1:09-cv-390-RLY-DML |
| ) | |
| G.H. HERRMANN FUNERAL HOMES, ) | |
| INC., ) | |
|     Defendant. ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and
PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Nicholas Pennington ("Plaintiff"), was employed by G.H. Herrmann Funeral Homes, Inc. ("Defendant" or the "Funeral Home") from February 6, 2001, until Plaintiff voluntarily terminated his employment on November 15, 2008. Plaintiff regularly worked two alternating work schedules: day shift weeks in which he worked 36 hours, and night shift weeks in which he worked 101.5 hours. On the weeks he worked the day shift, he was paid more per hour than the weeks during which he worked night shift, which included 61.5 hours of overtime. In his Complaint, Plaintiff alleges that the Funeral Home violated the Fair Labor Standards Act ("FLSA" or the "Act"), 29 U.S.C. § 201, *et seq.*, and the Indiana Wage Payment Statute, Indiana Code §§ 22-2-5 *et seq.*, by failing to pay him a proper overtime premium under the FLSA for hours worked in excess of 40 per workweek.

1

The parties now move for summary judgment. For the reasons set forth below, the court **GRANTS** in part, and **DENIES** in part, the Defendant's motion, and **DENIES** the Plaintiff's cross motion.

## I.      Evidentiary Submissions

Before addressing the relevant facts, the court must address whether the Declaration of Robert C. Hagemier and the (Second) Declaration of Jeff Herrmann are admissible.

### A.      Mr. Hagemier's Declaration

Robert C. Hagemier ("Mr. Hagemier") is counsel to the Indiana Funeral Directors Association, and has served in that capacity for over 25 years. As counsel to that Association, Mr. Hagemier is familiar with the pay practices used by many of its member funeral homes. In his declaration, Mr. Hagemier testified on matters such as the motivations of funeral homes in retaining night-time employees and the expectations funeral homes have for directors. (Declaration of Robert C. Hagemier ("Hagemier Dec.") ¶¶ 5-7). With respect to the customs in the funeral home industry, Mr. Hagemier opined:

> [i]t is customary in the industry from my experience for funeral homes who use the night man to provide on-premises services through the evening hours to pay a lesser hourly rate for his shift. The lesser rate reflects the expectation that most hours the night man spends in the funeral home during the evening hours will be spent in personal pursuits like sleeping, watching television, reading, entertaining personal visitors and the like. There are very few business needs by funeral homes during the evening hours (especially after 8:00).

(*Id.* ¶ 8). Mr. Hagemier's declaration concludes by stating that he "personally discussed

this pay practice with Jeff Herrmann," and that he "personally advised Jeff Herrmann that there is nothing illegal or unusual about this pay practice." (*Id.* ¶¶ 9, 10).

The court finds that Mr. Hagemier's opinions regarding why a funeral home would hire a night-shift employee, the functions of a night-shift employee, and the customary pay practice of funeral homes that employ night-shift employees, is expert testimony. Because Mr. Hagemier was not disclosed as an expert pursuant to FED. R. CIV. P. 26, the court strikes paragraphs 5-8 from his affidavit. That said, Mr. Hagemier, in his capacity as a lay witness, may testify as to matters within his personal knowledge. Thus, the court will credit his testimony that he advised Jeff Herrmann ("Mr. Herrmann"), the Vice President of Herrmann Funeral Home, that the Funeral Home's pay structure was legal. To be clear, the court is not admitting this testimony for the truth of the matter asserted; rather, it is admitted only to show that it was said.

**B.     (Second) Declaration of Jeff Herrmann**

Mr. Herrmann filed two declarations as evidence in this case. The declaration at issue is his second declaration (although it is not titled as such), in which he states that he "referred to G.H. Herrmann business records" and totaled the times in which Plaintiff performed certain tasks during his day shift as compared to his night shift between October 2006 and October 2008. For example, Mr. Herrmann states:

> [Plaintiff] performed 120 embalmings over the course of the 52 night-shift weeks between October 2006 and October 2008. During that same time period, [Plaintiff] performed 58 embalmings over the course of the 52 day-shift weeks.

((Second) Declaration of Jeff Herrmann ¶ 6).

The problem with Mr. Herrmann's declaration is that he does not append the business records that he relied upon as a foundation for his testimony, in violation of FED. R. EVID. 1006. Rule 1006 provides that for a party to use a summary rather than the underlying originals, the "originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place." There is no evidence that the Funeral Home made these documents available to Plaintiff prior to this court's ruling. Accordingly, Mr. Herrmann's statements amount to nothing more than inadmissible hearsay, and will not be considered[1] by the court.

## II.    Factual Background

1.  Plaintiff is a licensed funeral director/embalmer. (Deposition of Nicholas Pennington ("Plaintiff Dep.") at 15).

2.  Generally speaking, a funeral director manages funerals and assists other directors, while an embalmer prepares bodies. (Deposition of Melvin Tomlinson ("Tomlinson Dep.") at 5-6; Declaration of Jeffrey N. Herrmann ("Herrmann Dec.") ¶ 12).

3.  On February 6, 2002, Mr. Herrmann hired Plaintiff as a funeral director intern, during which time Plaintiff was required to work under the supervision of a licensed funeral director at all times. (Plaintiff Dep. at 36, 44; Herrmann Dec. ¶ 2).

---

[1] In any event, the evidence contained in Mr. Herrmann's declaration would not alter the court's opinion. (*See* Section IV.A.1 of this opinion).

4. In January of 2003, Plaintiff began working at night one week out of each month. (Plaintiff Dep. at 37; Herrmann Dec. ¶ 3).

5. In November 2004 or 2005, Plaintiff began an alternating weekly work schedule where he would work 36 day-shift hours one week, and 101.5 night-shift hours the next week. Plaintiff's day-shift weeks consisted of four 9-hour shifts, from 8:00 a.m. to 5:30 p.m., with a thirty-minute lunch break each day, while his night-shift weeks consisted of seven 14 ½-hour shifts, from 5:30 p.m. to 8:00 a.m. each shift. (Plaintiff Dep. at 38, 58-60, 62; Herrmann Dec. ¶ 4).

6. From 2003 until 2008, Plaintiff always earned a different, lower hourly rate of pay for the night shift than he earned during the day shift. Melvin Tomlinson, who is also a licensed funeral director/embalmer and has been employed at the Funeral Home for 33 years, works the same alternating weekly work schedule and has also always received a lower hourly rate for night-shift duties than for day-shift work. (Plaintiff Dep. at 39, 41, 87, 95; Tomlinson Dep. at 5-6, 9, 33; Herrmann Dec. ¶¶ 5-6).

7. During the weeks that Plaintiff worked 36 day-shift hours, his duties included: (1) taking first calls[2]; (2) making removals; (3) completing double-checks of clothing, caskets and bodies; (4) embalming; (5) helping with the crematory; (6) registering

---

[2] A "first call" is when a family member or medical provider calls to notify the funeral home that someone has died. The funeral home records the information and arranges a removal. (Plaintiff Dep. at 64). A "removal" is the removal of the body from the home or facility where the person died. (*Id*. at 9).

flower deliveries and organizing flower arrangements; (7) greeting, seating, and dismissing guests who came to the funeral home to attend a funeral service; (8) helping guests during a viewing; (9) parking cars for funeral attendees; (10) aiding with graveside services; (11) giving out pricing and account balance information; (12) collecting receivables; and (13) retrieving supplies. (Plaintiff Dep. at 63-68; Tomlinson Dep. at 8, 13; Herrmann Dec. ¶ 7).

8. Plaintiff was paid an hourly rate of $14.57 for the first 40 hours worked and $21.86 for hours worked in excess of 40 hours for all day-shift hours. (Plaintiff Dep. at 40; Herrmann Dec. ¶ 8).

9. According to the Funeral Home, during the weeks that Plaintiff worked 101.5 night-shift hours, his primary duties included: (1) embalming; (2) answering phone calls; and (3) cleaning. (Plaintiff Dep. at 81-83; Herrmann Dec. ¶ 9).

10. According to Plaintiff, his night-shift duties largely mirrored his day-shift duties. For example, Plaintiff testified that: (1) he responded to "first calls" during the day and night shifts; (2) he embalmed bodies during the day and night shifts; (3) he cosmetized bodies during the day and night shifts; (4) he dressed and casketed bodies during the day and night shifts; (5) he performed work related to floral arrangements for funerals during both the day and night shifts; (6) he directed funerals during the day and night shifts; (7) provided information for pricing, accounts receivable, and (8) assisted in collecting receivables during both the day and night shifts. (Plaintiff Dep. at 63, 64, 65, 66, 69, 70, 71, 72, 73, 74, 78;

    Tomlinson Dep. at 18, 12, 13, 14, 19, 20).

11. In addition to the duties described above, Plaintiff's night-shift duties included a security function. (Tomlinson Dep. at 32). Moreover, Plaintiff could sleep, watch television, play video games, receive personal phone calls, browse the internet, and have guests over. (Plaintiff Dep. at 76, 81; Tomlinson Dep. at 27, 35-36).

12. Plaintiff was paid an hourly rate of $11.24 for the first 40 hours worked and $16.86 for hours worked in excess of 40 for all night-shift hours. (Plaintiff Dep. at 39-40; Herrmann Dec. ¶ 10).

## III. Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

The moving party bears the burden of demonstrating the "absence of evidence on

an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To survive summary judgment, the non-moving party may not simply rest on the pleadings. *Green v. Whiteco Industries, Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322). Instead, the non-moving party must "point to specific facts showing that there is a genuine issue for trial; inferences relying on mere speculation or conjecture will not suffice." *Trade Finance Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-07 (7th Cir. 2009) (citing *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008). If the non-moving party fails to make that showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

**IV.     Discussion**

    **A.     Fair Labor Standards Act Claim**

Pursuant to the FLSA, an employer is required to pay employees one and one-half times their regular rate of pay for all hours worked over 40 in a particular workweek. 29 U.S.C. § 207(a)(1). Section 7(g)(2), however, provides a partial exemption from this requirement. "Section 7(g) permits an employer to pay an employee overtime compensation at one and one half times a different hourly rate than the employee's regular hourly rate when the employee performs two or more kinds of work and has reached an agreement or understanding with the employer that different rates apply to different kinds of work." *Mathias v. Addison Fire Protection District No. 1*, 43 F. Supp. 2d, 916, 920 (N.D. Ill. 1999) (citing 29 U.S.C. § 207(g)(2)). In order to satisfy the requirements of the Section 7(g)(2) exemption, an employer must demonstrate: (1) that

the employee performed two or more different kinds of work; (2) the employer established bona fide hourly rates for the different kinds of work; (3) the compensation was paid pursuant to an agreement or understanding between the employee and the employer in advance of the performance of the work; and (4) the overtime rates were computed at a rate not less than one and one-half times the normal applicable rate for the same work when performed during nonovertime hours. *Id.* at 920-21 (internal citations omitted); 29 U.S.C. § 207(g)(2). The employer bears the burden of establishing that it is entitled to the benefit of an exemption. *In re RBC Dain Rauscher Overtime Lit.*, – F. Supp. 2d –, 2010 WL 1324938, at *11 (D. Minn. March 31, 2010).

### 1. Different Kinds of Work

Neither the FLSA nor its regulations define the term "different kinds of work." In addition, there is little case law on the matter, and it appears to be a question of first impression in the Seventh Circuit. Thus, the court turns to the most analogous case law from other jurisdictions.

The most analogous case cited by the parties is *Townsend v. Mercy Hosp. of Pittsburgh*, 862 F.2d 1009 (3d Cir. 1988). In *Townsend*, the hospital scheduled surgeries between the hours of 7 a.m. and 5:30 p.m., and the operating rooms were covered by operating room personnel by two regular weekday shifts. *Id*. at 1010-11. The hospital also set up overtime shifts known as "on-premises-on-call" shifts to provide guaranteed staffing for off-hours emergency surgery. *Id*. at 1011. Surgical personnel assigned to the "on-premises-on-call" shifts were required to stay on hospital premises, but had no

9

assigned duties, and were free to eat, sleep, read, watch television, and the like. *Id*. Hospital personnel were paid a regular wage during the regular workday hours, but were paid the minimum wage for the on-premises-on-call shifts. *Id*. However, during active periods on the overtime shift, in which surgical personnel performed the same duties for which they were responsible during their regular weekday shift, they were paid one and one-half times their regular shift rate for all work performed. *Id*. For all work performed during the overtime shift in excess of 40 hours for the "on-call" time periods, plaintiff was paid one and one-half times the federal minimum wage. *Id*.

The court found that the "active work" performed by the operating room personnel during the regular shift was qualitatively different than the "stand-by/non-productive" periods on the overtime shift. *Id*. at 1012. The court further found that the hospital's compensation scheme did not run afoul of the FLSA because it based the operating room personnel's "active duty" pay during the overtime shift upon their regular weekday base rate of pay. *Id*.

According to the Funeral Home, Plaintiff's night-shift duties primarily consisted of embalming bodies, answering phone calls, cleaning, and providing security for the building. The Funeral Home contends that these duties are qualitatively different from the duties of a funeral director that Plaintiff performed during the day shift. To the extent that Plaintiff performed any other duties during the night shift, such as directing funerals, the Funeral Home contends that these duties were performed at such an irregular and insubstantial rate as to be immaterial. (*See, e.g.,* Defendant's Moving Brief, Facts

Section, at 6-9).

Plaintiff, on the other hand, contends that his night-shift duties were generally the same duties that he performed during the day, save for a few duties such as aiding with graveside services, delivering death certificates, parking cars, etc., that he performed only during the day shift. Thus, the kinds of work that he performed at night were, for the most part, not *different*. They were just performed less frequently.

The court agrees that, to the extent Plaintiff performed "funeral director" type work at night, Plaintiff's job duties during the day were the same job duties as those he performed at night. Under *Townsend*, it would seem that the Funeral Home was thus required to pay Plaintiff his regular hourly rate (and base his overtime pay on the regular hourly rate) for that time spent at night performing funeral director-type duties. The court is reluctant to grant summary judgment on this issue to either side, however, since Plaintiff's job duties at night, and the frequency with which he was called to perform those job duties, is a matter of dispute. Indeed, the parties do not even agree as to whether embalming is a job duty of a funeral director. Accordingly, the court finds that whether Plaintiff performed different kinds of work on the day shift as opposed to the night shift, and the frequency with which he performed those different job duties, is best left for a jury to decide. *See In re RBC*, – F. Supp. 2d – , 2010 WL 1324938, at *11 (quoting *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986) ("The question of how the [employees] spent their working time . . . is a question of fact. The question of whether their particular activities excluded them from the overtime benefits of the FLSA

is a question of law[.]")); *Fenton v. Farmers Ins. Exch.*, 663 F. Supp. 2d 718, 724 (D. Minn. 2009) (same).

### 2. Bona Fide Hourly Rate

An employee's hourly rate "will be regarded as a bona fide rate for a particular kind of work if it is equal to or greater than the applicable minimum rate therefor and if it is the rate actually paid for such work when performed during nonovertime hours." 29 C.F.R. § 778.419(b). When an employee is engaged in two or more types of work, an employer can pay the employee for overtime work at one and one-half times the rate which the employer normally pays for that type of work. *Townsend*, 862 F.2d at 1014. To the extent that Plaintiff was engaged in two different kinds of work on the day shift and night shift, the lower wage paid for the night-shift work was a bona fide hourly rate. However, since the issue of whether Plaintiff performed different kinds of work is in dispute, this issue must also go to the jury.

### 3. Agreement or Understanding Before the Work Was Performed

As noted above, before a plaintiff may be paid two different wages for two different kinds of work, the plaintiff must have agreed or understood the same. Plaintiff alleges that he was unaware of the discrepancy between the hourly rates before he agreed to work for Defendant, and that he only found out when he received his first paycheck. (Plaintiff Dep. at 41-42). The fact that Plaintiff continued to work for the Funeral Home for an additional seven years is evidence that he Plaintiff assented to the different rates of

pay. *See generally, Holb v. City of Beaufort*, 1993 WL 219806, at *5 (4th Cir. June 22, 1993) ("An employee's continuous employment is evidence of an implied agreement with the pay system of the employer."). The court therefore finds that Plaintiff understood that he was receiving two different rates of pay.

### 4. Normal Applicable Rate

The final issue is whether Plaintiff was paid the normal applicable rate for overtime wages. This issue hinges on the type of work he performed at night. Accordingly, this issue, like the others, is best left for a jury.

### B. Different Rates for Different Shifts

The FLSA permits employees performing identical job functions to be paid different rates when working different shifts so long as the compensation structure is not designed to circumvent the purpose of the Act. *See Parth v. Pomona Valley Hosp. Med. Ctr.*, 584 F.3d 794, 803 (9th Cir. 2009) ("We find no authority that suggests employees cannot be paid different rates for different shifts."). The issue here, of course, is whether the Funeral Home's compensation structure was designed to circumvent the purpose of the Act. Given the court's ruling above with regard to the Funeral Home's Section 7(g) argument, the court finds that this issue must be resolved by a jury.

### C. Liquidated Damages

An employer who violates the overtime provisions of the FLSA is liable in the amount of unpaid overtime compensation and "an additional equal amount in liquidated damages." 29 U.S.C. § 216(b). However, it is within a district court's discretion to

award no liquidated damages or a smaller amount of liquidated damages if the employer demonstrates the acts or omissions were in good faith and the employer had a reasonable ground for believing the acts or omissions were not a violation of the FLSA. 29 U.S.C. § 260.

Mr. Herrmann was advised by attorney Mr. Hagemier that the Funeral Home's compensation structure was lawful. In the absence of any other evidence putting this evidence into doubt, the court finds that Plaintiff is not entitled to liquidated damages at this time.

### D.    Statute of Limitations

The statute of limitations for a violation of the FLSA is two years, unless the violation that caused the suit was willful, in which case the statute of limitations is three years. 29 U.S.C. § 255. In this context, willful is defined as requiring that the employer knew or showed reckless disregard as to the legality of the FLSA violation. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 128 (1985)). Plaintiff has brought forth no evidence that the Funeral Home knew or should have known that its pay structure was a violation of the FLSA. Indeed, the evidence is to the contrary. As such, the applicable time frame for this case is two years prior to the filing of the Complaint.

### D.    Indiana Wage Payment Statute

The Indiana Wage Payment Statute provides for a penalty equal to 10% of unpaid wages due if an employer fails to make payment of wages within ten days of the pay

14

period during which those wages were earned. Ind. Code § 22-2-5-2.  Both sides agree that this statute only comes into play if the Funeral Home violated the FLSA.  As the court found an issue of fact as to whether the Funeral Home violated the FLSA, the court must find an issue of fact with respect to Plaintiff's Indiana law claim as well.

### V.     Conclusion

For the reasons set forth above, the court **DENIES** Defendant's Motion for Summary Judgment (Docket # 30) with respect to Plaintiff's FLSA and Indiana Wage Payment claims, and **GRANTS** Defendant's Motion for Summary Judgment with respect to Plaintiff's liquidated damages claim.  The court further **DENIES** Plaintiff's Cross Motion for Summary Judgment (Docket # 34) with respect to Plaintiff's FLSA and Indiana Wage Payment claims, and **DENIES** Plaintiff's Cross Motion for Summary Judgment with respect to Plaintiff's liquidated damages claim

**SO ORDERED** this  23rd  day of August 2010.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Rebecca Lynn Brettin
GIBBONS JONES P.C.
rbrettin@gibbonsjones.com

Philip J. Gibbons Jr.
GIBBONS JONES, P.C.
pgibbons@gibbonsjones.com

Laura E. Howard
BOSE MCKINNEY & EVANS, LLP
lhoward@boselaw.com

Andrew G. Jones
GIBBONS JONES P.C.
ajones@gibbonsjones.com

David L. Swider
BOSE MCKINNEY & EVANS, LLP
dswider@boselaw.com

Emily L. Yates
BOSE MCKINNEY & EVANS, LLP
eyates@boselaw.com